# United States Court of Federal Claims

No. 18-528 C
Filed: August 27, 2018
Reissued: September 19, 2018[1]

|  |  |
|---|---|
| RCF INFORMATION SYSTEMS, INC., | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) ) |
| Defendant. | ) ) ) |

*Daniel I. Prywes*, Morris, Manning & Martin, LLP, Washington, DC, for plaintiff.

*Andrew James Hunter*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

    This post-award bid protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, RCF Information Systems, Inc. ("RCF"), challenges the decision of the United States Department of the Air Force (the "Air Force" or "Agency") to award three indefinite-delivery, indefinite-quantity ("IDIQ") contracts under Solicitation No. FA8604-16-R7005 ("Solicitation" or "RFP") to Decypher Technologies, Ltd. ("Decypher"), Mission Services, LLC ("MSI"), and Stellar Innovations & Solutions, Inc. ("Stellar"). The Solicitation seeks Information Technology ("IT") support services for the Air Force Research Laboratory ("AFRL") at Wright-Patterson Air Force Base, which oversees "critical research efforts for the Air Force" and the Department of Defense ("DOD"), and develops technology that "contributes to significant advances in modern communications, electronics, manufacturing and medical research." Administrative Record (hereinafter "AR") 72, 1068. In its Complaint, RCF asserts that the Agency's award to the three successful bidders was arbitrary and capricious, contrary to law, and without a rational basis. Complaint (hereinafter "Compl.") at 2. For the following reasons, plaintiff's Motion for Judgment on the

---

[1] An unredacted version of this opinion was issued under seal on August 27, 2018. The parties were given an opportunity to propose redactions, and those redactions are reflected herein.

Administrative Record is denied, and defendant's Cross-Motion for Judgment on the Administrative Record is granted.

## I. Background

On September 9, 2016, the Air Force issued the Solicitation for IT support services at the AFRL. AR 1068. The AFRL is the lead research organization for the Air Force and the DOD, and, it requires a full range of IT services in order to perform its research and development mission. AR 72, 220. The Solicitation anticipated the award of one or more "Firm Fixed Price [IDIQ] contracts" for IT services, including but not limited to customer support, application development, configuration management, network implementation, systems integration and administration, communication support, video teleconference support, and cybersecurity. AR 167, 220. The Solicitation was a small business set-aside, and it contemplated issuing three task orders upon award of the contracts, one each to the three offerors with the lowest Total Evaluated Price ("TEP"). AR 168, 429.

Pursuant to the RFP, proposals would be evaluated on a Lowest Priced, Technically Acceptable ("LPTA") basis, and the following three factors would be assessed: (1) Technical, (2) Past Performance, and (3) Price. AR 429-31. Evaluation of the Technical Factor was bifurcated between two subfactors, Transitional Approach and IT support. AR 430-31. The Solicitation stated that "[t]he Government will select the proposal(s) with the lowest total evaluated price(s) [] from among those that are award-eligible (meets all RFP requirements), meet all price criteria, are technically acceptable (Factor 1) and have an acceptable past performance record (Factor 2)." AR 429.

The Solicitation indicated that each Technical Subfactor would receive a rating of "Acceptable" or "Unacceptable," and, to be deemed "Acceptable," offerors' proposals must "meet all of the Measures of Merit within a given subfactor." AR 431. The required Measures of Merit for the Transition Approach were as follows: (a) appropriate skillsets, (b) appropriate experience, (c) required certifications, (d) required security clearances, and (e) sufficient quantities and labor mix to meet performance requirements of the Performance Work Statement. *Id.* The Solicitation highlighted the importance of staffing throughout the transition, stating that, if there was not an appropriate staffing plan, "negative operational impact may occur." AR 75. The Measures of Merit for the IT Support subfactor included the following management-centered requirement: "(d) providing personnel certified in accordance with DOD Information Assurance Workforce Improvement Program (DOD 8570.1-M) as described in DFAR 252.239-7001 with SECRET or TOP SECRET (as applicable) security clearances that will provide a fully functional team on Day 1 of contract performance." AR 432.

The Solicitation informed offerors that, under Factor 3, Price, proposals would be evaluated for the following: "(1) completeness, (2) reasonableness, (3) unbalanced pricing, and (4) Total Evaluated Price." AR 435. The Solicitation stated that TEP would "be calculated as the sum of the offeror proposed prices for the three (3) initial task orders including the base year, all option years, and the Extension of Services period." *Id.* The reasonableness threshold was determined ████████████████████████████████████████████████ *See* AR 15511. ███████

2

████████████████████████████████████████████████████████████ *Id.* Any proposed price above that would be considered unreasonable. *Id.*

The Agency received ████████ proposals, of which ██████ offerors were determined to fall within the competitive range. AR 16006, 16009. The Technical Evaluation Team then evaluated each proposal within the competitive range "against the Government's minimum requirements to determine whether the proposal is acceptable or unacceptable." AR 128. A proposal was rated "Acceptable" under a subfactor if it met all of the requirements for the associated Measures of Merit with no unresolved Evaluation Notices ("ENs"). AR 15404. If any subfactor was rated "Unacceptable," the entire proposal would be rendered unacceptable and ineligible for award. AR 128. The Agency engaged in three rounds of discussions, and, upon submission of Final Proposal Revisions, all offerors in the competitive range "responded adequately and remained fully qualified Technically, for Past Performance, and for Price." AR 15407-08. The Source Selection Evaluation Board recommended that the task orders be given to Decypher, MSI, and Stellar because "the three (3) offerors were technically acceptable, had acceptable past performance, and had the lowest overall TEPs." AR 16010.

On January 8, 2018, the Agency informed the three awardees that they would each receive one of the three task orders. AR 16012, 16015, 16021. On that same day, RCF was notified that it did not receive the award. AR 16434. On February 19, 2018, RCF filed a protest with the Government Accountability Office ("GAO"), alleging, among other things, that "the agency suspended reality, awarding contracts to three entities that proposed extraordinarily low pricing that will effectively preclude the awardees both from recruiting and retaining qualified personnel, and from maintaining service levels throughout performance." AR 16536. The GAO dismissed the protest on March 16, 2018, finding that "a lower price, in and of itself, does not mean that an awardee cannot recruit and retain qualified staff." AR 16565, 16566. The GAO further found that, "[w]hile RCF has cast its allegation as a challenge to the agency's evaluation of the awardees' staffing approaches, its fundamental argument is that the agency improperly failed to conduct a price realism analysis," which, the GAO determined, "is neither required nor permitted in awarding fixed-price contracts." AR 16567 (citing *Emergent Techs., Inc.* B-407006, Oct. 18, 2012, 2012 CPD ¶ 295 at 5-6).

On April 10, 2018, plaintiff filed its Complaint with this Court, alleging the following three counts: (i) the Agency used unstated evaluation criteria concerning the minimum staffing level for Task Order 1, in violation of the Federal Acquisition Regulation ("FAR") § 15.303(b)(4); (ii) the Agency engaged in insufficient and unequal discussions with RCF regarding its price, in violation of FAR § 15.303(d)(3); and (iii) the Agency misevaluated technical offers regarding the staffing plans to retain and hire staff, in violation of 5 U.S.C. § 706(2)(A). *See generally* Compl.; Memorandum in Support of Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "P's MJAR") at 21. Plaintiff is no longer pursuing Count II. P's MJAR at 21.

On May 9, 2018, plaintiff filed its Motion for Judgment on the Administrative Record and Memorandum in Support of Plaintiff's Motion for Judgment on the Administrative Record, alleging that the Agency's award to Decypher, MSI, and Stellar was arbitrary, capricious, and contrary to law. *See generally* Plaintiff's Motion for Judgment on the Administrative Record;

*see also* P's MJAR.  On May 23, 2018, defendant filed its Response to plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record.  *See generally* Defendant's Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record (hereinafter "D's CMJAR").  On June 4, 2018, plaintiff filed its Reply in support of its Motion for Judgment on the Administrative Record and Response to defendant's Cross- Motion for Judgment on the Administrative Record.  *See generally* Plaintiff's Reply Memorandum in Further Support of Plaintiff's Motion for Judgment on the Administrative Record and Plaintiff's Opposition to Defendant's Cross-Motion for Judgment on the Administrative Record (hereinafter "P's Reply").  On June 18, 2018, defendant filed its Reply in support of its Cross-Motion for Judgment on the Administrative Record.  *See generally* Defendant's Reply to Plaintiff's Response to Defendant's Motion for Judgment on the Administrative Record (hereinafter "D's Reply").  The Court held Oral Argument on this matter on July 24, 2018.  The motions are fully briefed and ripe for review.

## II.     Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which provides the Court of Federal Claims with the power "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2012).  Although the Tucker Act explicitly waives the sovereign immunity of the United States against such claims, it "does not create any substantive right enforceable against the United States for money damages."  *United States v. Testan*, 424 U.S. 392, 398 (1976).  Rather, to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages."  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

The Tucker Act also affords this Court with jurisdiction over bid protest actions.  28 U.S.C. § 1491(b).  This Court evaluates bid protests under the Administrative Procedure Act's ("APA") standard of review for agency actions.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Notably, agency procurement actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  28 U.S.C. § 1491(b)(4).  Moreover, "[t]he arbitrary and capricious standard applicable [in bid protests] is highly deferential."  *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  Agencies, and contracting officers in particular, are "'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process.'"  *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa*, 238 F.3d at 1332).

Under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), a party may file a motion for judgment upon the administrative record for the Court to assess whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review.  *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Supp. Servs. v. United States*,

71 Fed. Cl. 585 (2006)). On a motion for judgment upon the administrative record, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record. RCFC 52.1; *Bannum*, 404 F.3d at 1354. Looking to the Administrative Record, the Court must determine whether a party has met its burden of proof based on the evidence in the record. *Id.* at 1355. When a protestor claims that an agency's decision violates a statute, regulation, or procedure, the protestor must show that such alleged violation was "clear and prejudicial." *Impresa*, 238 F.3d at 1333. The Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.-Fed. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)). "If the [C]ourt finds a reasonable basis for [an] agency's action, the [C]ourt should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). The Court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

### III. Discussion

#### A. Staffing Plan

In its Motion for Judgment on the Administrative Record, plaintiff alleges that the Agency's evaluation of the awardees' technical proposals was arbitrary, capricious, and contrary to law, "because the Agency unreasonably and irrationally found the awardees' proposals for hiring and retaining staff under Technical Subfactor 1 and 2 to be 'technically acceptable' and therefore eligible for award." P's MJAR at 23 (citing AR 15640, 16010). In making its argument, plaintiff points to the Solicitation requirements for both Technical Subfactors. Subfactor 1 required that the Agency evaluate whether a proposal addressed a "separate comprehensive staffing plan for each of the three initial task orders for obtaining and maintaining personnel with" appropriate skillsets, experience, certificates, and clearances. AR 431. Subfactor 2 required an evaluation of whether a proposal "evidences a thorough understanding and execution of the requirement" for "[r]etaining qualified personnel and maintaining services levels throughout performance," providing personnel with the requisite security clearances "on Day 1," and "[p]roviding detailed identification of processes, programs, and benefits for recruiting and retaining a qualified, experienced, and well-trained staff." AR 432.

Plaintiff argues that the Agency's determination that all ▬▬▬ offerors in the competitive range met the Measures of Merit for Technical Subfactor 1 and 2 was arbitrary, "because the Agency never stopped to consider whether the bidders (including the awardees) could attract and retain incumbent employees (or others) at pricing vastly lower than that offered by the incumbent (RCF) . . .and with vast discrepancies among the putative 'competitive' rates offered by the three winning bidders." P's MJAR at 24. Plaintiff further contends that "[t]he ▬▬▬▬▬▬▬▬ disparity between ▬▬▬▬ TEP and RCF's TEP (AR 16010) should have alerted the Agency and caused it to examine the technical staffing proposals of ▬▬▬ and others to determine their plausibility in the context of their respective price proposals." *Id.* at 24-25. Finally, plaintiff asserts that the labor-rate differences between the three awardees were "so disparate that the Agency could have no confidence that any of those bidders had a real

understanding of the labor-rate levels needed to attract and retain incumbent employees (and others) so that the bidders could start work with a 'fully functional' team on 'Day 1.'" *Id.* at 25 (citing AR 435). The Court is not persuaded by plaintiff's argument.

In its Response and Cross-Motion for Judgment on the Administrative Record, the government suggests that plaintiff's argument is an attempt to force a cost realism analysis on a LPTQ procurement that merely requires a price reasonableness analysis. D's CMJAR at 16. A cost realism analysis examines whether "costs in an offeror's proposal (1) are realistic for the work to be performed; (2) reflect a clear understanding of the requirements; and (3) are consistent with the various elements of the offeror's technical proposal." 48 C.F.R. § 2.101. This differs from price reasonableness, which, this Court has held, "generally addresses whether a price is too high, whereas cost realism generally addresses whether a cost estimate is too low." *First Enterprise v. United States*, 61 Fed. Cl. 109, 123 (2004); *see also Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 264 (2011).

The Solicitation sought to award firm-fixed-price IDIQs. *See* AR 166. A firm-fixed-price contract "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract . . . [and] places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss." 48 C.F.R. § 16.202-1. The Solicitation required evaluation of prices for completeness, reasonableness, unbalanced pricing, and TEP. AR 435, 717. Plaintiff argues that "the Agency never stopped to consider whether the bidders . . . could attract and retain incumbent employees (or others) at pricing vastly lower than that offered by the incumbent." P's MJAR at 24. This perfectly reflects the intent behind a cost realism analysis, which asks whether the price is "realistic for the work to be performed." 48 C.F.R. § 2.101.

Where, as in the case at bar, a solicitation does not require a cost realism analysis, this Court has held that "it is rational for the contracting officer *not* to do a cost realism analysis . . ., since the offeror not the government, bears the risk of unreasonable estimates in fixed price contracts." *First Enterprise*, 61 Fed. Cl. at 123 (emphasis added). As the Solicitation did not require a cost realism analysis, the Agency was under no obligation to perform one, and evaluation of price under a cost realism analysis would have run contrary to the Solicitation's requirements. *See e.g.* AR 435. Therefore, the Agency's price reasonableness analysis and ensuing determination that the awardees met the requirements under Technical Subfactor 1 and 2 were neither arbitrary, capricious, nor contrary to law.

### B. Mandatory Minimum

In addition to its cost realism argument, plaintiff alleges that RCF was prejudiced by the Agency's use of an unstated mandatory minimum in violation of the FAR. P's MJAR at 30. In support of its argument, plaintiff points to two instances in which the Agency informed offerors that their proposed numbers of Full Time Equivalents ("FTE") were insufficient to perform the work under the task orders. First, plaintiff notes that the Agency evaluated ▓▓▓▓▓ ▓▓▓▓▓ proposal of ▓ FTEs and determined that "[s]ervice levels would not be able to be maintained at the current levels with a reduction of ▓ FTEs ▓▓▓ across the various labor categories for Task Order 1." AR 4503. Second, plaintiff points to the Agency's determination

that ▉ initial proposal, which only included ▉ FTEs, was "deficient in sufficient quantities and labor mix for the transition approach." AR 9658, 1604. RCF's proposal included ▉ FTEs for Task Order 1. AR 13164.

Plaintiff has concluded that the Agency used a minimum staffing level in evaluating proposals, based on the original declaration of Kenneth Holder, the Chief Operating Officer for RCF. *See* AR 16564. In his March 12, 2018 declaration, Mr. Holder stated that "I was informed by a person familiar with the AFRL Procurement that the agency had used a minimum staffing level of 40 persons to evaluate Task 1. I was further told that certain offerors who had proposed less than 40 persons would have been technically unacceptable and thus were issued EN's [*sic*] to allow them to increase the number of FTEs for Task 1." *Id.*

Plaintiff contends that "it would have substantially lowered its proposed staffing level if it knew that the Agency had an undisclosed mandatory minimum staffing requirement." P's MJAR at 31. The crux of plaintiff's argument seems to center on the fact that RCF was not told that *other offerors'* staffing plans were deficient and required revision. Plaintiff is inferring a mandatory minimum requirement from the fact that two offerors with deficient initial proposals were included within the competitive range once their revised proposals increased the number of FTEs for Task Order 1. However, plaintiff fails to consider that, along with increasing the number of FTEs, ▉ and ▉ also revised their proposed labor mixes, an equally important factor in the Agency's evaluation of proposals. Furthermore, other than within the Declaration of Mr. Holder, *plaintiff's* Chief Operating Officer, plaintiff has not pointed to any instance in which a mandatory minimum was either expressly stated or implied. Looking to the Administrative Record as a whole, there is insufficient evidence to support plaintiff's assertion that an undisclosed mandatory minimum exists.

Even if such a mandatory minimum existed, plaintiff cannot show that it was prejudiced by it. This Court has previously held that "mandatory minimum requirements are essentially pass/fail in nature and may lead to the outright rejection of a proposal that falls short of what they specify." *ManTech Telecomms. & Info. Sys., Inc. v. United States*, 49 Fed. Cl. 57, 67 (2001) (internal citations omitted). Moreover, a mandatory minimum requirement serves to "'put offerors on notice' of the serious consequences of failing to meet the requirement." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 382 (2003), *affirmed*, 356 F.3d 1345 (Fed. Cir. 2004) (quoting *Isratex, Inc. v. United States*, 25 Cl. Ct. 223, 229 (1992)). In the case at bar, there were no "serious consequences of failing to meet the requirement," *Banknote*, 56 Fed. Cl. at 382, as offerors with insufficient quantities of FTEs and labor mixes were provided with ENs and given the chance to revise their proposals. Plaintiff proposed ▉ FTEs for Task Order 1. AR 13164. As a result, the Agency had no reason to issue a staffing-related EN, as RCF's proposal was sufficient in quantity and labor mix. In conclusion, along with its inability to demonstrate that an undisclosed mandatory minimum existed, plaintiff cannot establish that such a requirement would have prejudiced RCF in any way.

### C. Motions to Supplement the Administrative Record

Finally, both plaintiff and defendant have filed a number of separate Motions to supplement the administrative record. When evaluating bid protest cases, this Court is limited to

7

making findings of fact based on the record before it. *See Bannum*, 404 F.3d at 1356; *see also Stanton v. United States*, 111 Fed. Cl. 263, 266 (2013) (noting that the parties' ability to supplement the administrative record is "limited"). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *see also Miller v. United States*, 119 Fed. Cl. 717, 726 (2015); *Stanton*, 111 Fed. Cl. at 266; *Sieben v. United States*, 108 Fed. Cl. 1, 6 (2012). Therefore, evidence not included in the administrative record before this Court should only be examined if the failure to do so would preclude "effective judicial review." *Axiom*, 564 F.3d at 1380.

This Court previously granted plaintiff's Motion to Supplement the Administrative Record with the Declaration of Kenneth Holder, but found the revised declaration to be superfluous. Upon review of the two outstanding Motions to supplement the administrative record, this Court does not believe that supplementation is necessary for "effective judicial review." *See Axiom*, 564 F.3d at 1380. As such, both those Motions are denied.

## IV. Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is **DENIED**. Defendant's CROSS-MOTION for Judgment on the Administrative Record is **GRANTED**. Defendant's MOTION to Supplement the Administrative Record is **DENIED**. Plaintiff's MOTION to Supplement the Administrative Record is **DENIED**. The Clerk is directed to enter judgment in favor of defendant, consistent with this opinion.[2]

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge

---

[2] This opinion shall be unsealed, as issued, after September 10, 2018, unless the parties identify protected and/or privileged materials subject to redaction prior to that date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons therefor.